MICHAEL E. KIRBY, Judge.
_JjThis is an appeal by the New Orleans Department of Police (“NOPD”) from three rulings of the Civil Service Commission for the City of New Orleans (“Commission”) involving plaintiff, Simon Har-grove. After being denied permanent status as a police sergeant, plaintiff appealed to the Commission, alleging that he was discriminated against on the basis of race. In his appeal, he asks for retroactive promotions to sergeant and lieutenant, and to be awarded back pay and emoluments of office.[1]
Following a hearing, the hearing officer recommended to the Commission that plaintiffs appeal be granted and that he be restored to the rank of sergeant retroactive to March 3, 1995. On October 3, 2000, the Commission rendered a decision granting plaintiffs appeal and ordering that his promotion to the rank of sergeant be made retroactive to January 25, 1996. In that ruling, the Commission rejected' as too speculative plaintiffs claim that he should also be promoted to the rank of lieutenant. Plaintiff applied to the Commission for reconsideration of his claim regarding promotion to lieutenant, and on December 14, 2000, the | gCommission reversed its earlier ruling and promoted plaintiff to the rank of lieutenant retroactive to July 23, 1997. The Department of Police applied for reconsideration of the Commission’s December 14, 2000 ruling, but its motion was denied on January 25, 2001. The Department of Police appeals the Commission’s rulings of October 3, 2000, December 14, 2000 and January 25, 2001.
At the Civil Service hearing, the first witness was plaintiff, who stated his rank at that time as Police Officer IV (PO-IV). Plaintiff stated that at the time of the hearing, he had been a member of the NOPD for approximately twelve years. He is currently assigned to the 3rd District, but he was assigned to the 8th District from March 3, 1995 until February 25, 1996. Plaintiff was promoted to the rank of police sergeant in March 1995, but that rank could not be made permanent until the satisfactory completion of a twelve-month probationary period. Plaintiff was assigned the position of platoon supervisor at the 8th District.
For the first two to three months that he was assigned to the 8th District, his immediate supervisor was Lieutenant Susan Graham. Lieutenant Mark Willow was his immediate supervisor for the remainder of his assignment at the 8th District, except for the last two weeks. His immediate supervisor during his last two weeks at the 8th District was Lt. Richard Casanova. During his entire time at the 8th District, the next person in the chain of command above his immediate supervisor was Lieutenant Melvin Howard, the assistant commander of the district, and the final person in the district level chain of command was Captain Gerald |3Ursin, the commander. Plaintiff and Lt. Howard are black, and Lt. Willow and Captain Ursin are white.
Plaintiff testified that Lt. Willow conducted most of his bimonthly evaluations *631 during his probationary period. Neither Lt. Graham nor Lt. Casanova conducted any written evaluations of plaintiff. At the end of plaintiffs probationary period, Lt. Howard conducted his working test period evaluation. Plaintiff was denied permanent status as a police sergeant and was returned to his position of PO-IV.
The bimonthly evaluation, form includes eight categories and has a rating system consisting of “Outstanding,” “Exceeds Requirements,” “Competent,” “Needs Improvement” and “Unsatisfactory.” Lt. Willow evaluated plaintiff on August 23, 1995, October 22, 1995, and January 6, 1996. Lt. Willow did not give plaintiff any rating below “Competent” in any of his evaluations. -For all three evaluations, Lt. Willow’s overall rating of plaintiff was “Exceeds Requirements.”
On the January 6, 1996 evaluation, in a section entitled “Employee’s comments,” the following was typed: “Lacks ■ leadership ability, week [sic] communication skills, work usually has many errors. Employee is competent at best.” Plaintiffs signature appears under that section, but he testified at the hearing that those were not his comments and they were not on the form when he signed it.
Plaintiff stated that he also received yearly Civil Service- evaluations. Lt. Willow conducted his 1995 yearly evaluation on January 20,1996. He said that)¿during the eleventh month of the probationary period, there is a final evaluation form to be filled out on the probationary employee, and that form is called the “11th Month Probationary Evaluation.” It is known as the working test period evaluation. According to plaintiff, the typical procedure was that either an officer’s immediate supervisor or the person who supervised him or her for at least a ninety-day period during the probationary period completed the working test period evaluation. When his evaluation was conducted on February 19, 1996, Lt. Willow was no longer at the 8th District and he had, a new supervisor, Lt. Casanova. Lt. Melvin Howard conducted the February 19, 1996 evaluation. Plaintiff stated-that Lt. Howard had never been his direct supervisor, but he was in his chain of command as assistant commander of the 8th District., He also stated that it was customary for this form to be completed by the probationary employee’s immediate supervisor of at least ninety days even if that supervisor had been transferred to a new location.
The working test period evaluation rates probationary employees’ performance in fifteen tasks, using-the same rating system as that of the bimonthly evaluations conducted during the working test period. Lt. Howard -rated- plaintiffs performance “Competent” ■ in three tasks, “Needs Improvement” in five tasks and “Unsatisfactory” in four tasks, with three tasks not applicable. Based on his evaluation of plaintiff, Lt. Howard recommended that he be denied permanent status as police sergeant and that his probationary period be extended an additional | Bsix months. Captain Ursin, the commander of the 8th District, approved the recommendation of Lt. Howard.
He said that Lt. Howard discussed his evaluation with him. Plaintiff stated that he signed the evaluation under orders, even though there' was not a report attached to the evaluation, , as plaintiff thought was required. He later admitted he did not know if the attachment of a report was a requirement. Plaintiff made a notation on the evaluation that he wanted to review the report. He said that when he made that notation, Captain Ur-sin had not yet signed the evaluation form. Plaintiff said he saw a report later.
Plaintiff, stated that he was given an “Unsatisfactory” rating' for his perfor- *632 manee in 1995 at his Civil Service rating hearing. He appealed that rating, and after a hearing, his rating was changed to “Competent.” That change in his Civil Service rating had no effect on his working test period evaluation or on his probationary status.
Plaintiff also said that contrary to Lt. Howard’s recommendation, his probationary period was never extended; he was simply returned to his earlier rank of PO-IV. Plaintiff stated that there is no provision in the Civil Service Commission rules for an extension of the probationary period. When asked by the hearing-officer if anyone in the chain of command could conduct the working test period evaluation, plaintiff said that there were no specific rules on this, but that his understanding is that an officer’s direct supervisor is responsible for his or her evaluation.
| ¡¿Plaintiff testified that at his Civil Service rating hearing, Captain Ursin and Lt. Howard were allowed to testify, but plaintiffs request that Lt. Willow be allowed to testify was denied. He said that another officer, Michael Sposito, was promoted to sergeant at approximately the same time as him, and his working test period covered the same general period. Lt. Willow was also Sergeant Sposito’s immediate supervisor. Lt. Willow was allowed to conduct Sergeant Sposito’s working test period evaluation on February 26, 1996. Sergeant Sposito is white.
He said that Lt. Howard was promoted to lieutenant at the same time plaintiff was promoted to sergeant. He said that promotional exams were given pursuant to the Williams consent decree, which resulted from the case of Larry Williams v. City of New Orleans, Department of Police. Plaintiff said that he was allowed to take the exam for lieutenant and captain while a probationary sergeant because the Williams consent decree allowed testing for a rank two levels above a qualifying officer’s rank.
Plaintiff stated that he passed the lieutenant’s exam while a probationary sergeant. He said that under the banding system set up by the Williams consent decree, everyone in the band is equal. His passing the lieutenant’s exam put him on the list to become a probationary lieutenant as soon as he achieved permanent status as a sergeant. He was in band three of the promotional list for the rank of lieutenant. Each band had to be exhausted before those in the next band were promoted. At the same time plaintiff was a probationary sergeant, Lt. Howard was a probationary lieutenant.
17Plaintiff explained that the position of lieutenant would not be held open for him, but once he was a permanent sergeant for one year, the next lieutenant’s position available would go to him automatically. So Lt. Howard was two years ahead of plaintiff in this ranking process. Plaintiff took the captain’s exam, but he testified that he did not know the results of that exam and he did not have any documentation showing that he was on the captain’s list. He said Lt. Howard is on the captain’s list.
On cross-examination, plaintiff testified that he received a letter dated February 22, 1996 from Police Superintendent Richard Pennington, informing him that he was being reassigned to his previous classification as a PO-IV. In the letter, the Superintendent stated that in plaintiffs- probationary period as sergeant, he was either unwilling or unable to exercise the responsibility expected of a police sergeant. The Superintendent stated that any questions should be addressed in writing to the Civil Service Department within thirty days, but that this was not considered a disciplinary action warranting an appeal hearing.
*633 Plaintiff stated that he requested an appeal for not being granted permanent status, alleging that the denial of permanent status to him was racially discriminatory. He alleged that the person who committed the discriminatory action was Captain Gerald Ursin. He notes that Lt. Willow, who was aware of his performance on a day-today basis, rated his performance as a probationary sergeant as “Exceeds Requirements.” Plaintiff said he did not know the reason for Lt. Willow’s transfer to another district toward the end of plaintiffs probationary |Rperiod. Plaintiff testified that Captain Ursin was responsible for the decisions made in the 8th District, and he 'could have allowed Lt. Willow to come back and do the working test period evaluation of plaintiff.
He said he did not have any evidence that Captain Ursin circumvented the Civil Service Rules and prevented Lt. Willow from doing the evaluation. Plaintiff admitted that there is no Civil Service rule stating that a probationary officer’s immediate supervisor is the person who must conduct evaluations. He could not identify any written rule or policy that Captain Ursin violated in the entire evaluation process for his working test period as sergeant. The only Civil Service rule he could cite was one that stated that an employee’s Civil Service rating is to be made by the supervisor most familiar with the employee’s work during the rating period. Lt. Willow was the person who conducted plaintiffs Civil Service evaluation in 1995.
When asked what- objective facts he could point to that would indicate' racial discrimination against him by Captain Ur-sin, plaintiff said he received a written reprimand for a uniform infraction, while a white female officer who committed a similar uniform infraction was not reprimanded. However, plaintiff admitted he had no documentation to prove that, and he could not recall the other officer’s name. He said that he was held more' accountable than Lt. Willow for reports that he wrote and Lt. Willow approved, even though both he and Lt. Willow were probationary officers at the time.
lflHe also noted that he and a white permanent sergeant were equally investigated for an incident in which they were involved, even though it is customary for an officer with more seniority to be held to a higher standard. Plaintiff admitted later in his testimony that Captain Ursin was not the officer who initiated the investigation against him and the white permanent sergeant. But he claimed that Captain Ursin’s statements during a hearing on this incident showed that he placed blame for the incident on plaintiff rather than the permanent sergeant. Plaintiff also stated that he was ultimately exonerated for the incident.
Plaintiff also alleged that Captain Ursin discriminated against him on the basis of race by not allowing Lt. Willow to conduct his working test period evaluation. He pointed to the fact that Captain Ursin allowed Lt. Willow to conduct the working test period evaluation for Sergeant Sposi-to, a white officer, -a week after plaintiffs evaluation.
After Lt. Howard recommended denying permanent status to plaintiff, his recommendation was forwarded to Captain Ur-sin. Plaintiff admitted that Captain Ursin could have reversed Lt. Howard’s recommendation if he disagreed with it. He also admitted that everyone else higher than Captain Ursin in the’chain of command, two black and one white, could have reversed the recommendation that plaintiffs permanent status be denied, but none did. They all chose to follow Lt. Howard’s recommendation that plaintiff be denied permanent status.
*634 Plaintiff was asked about a March 10, 1995 memorandum from him to Lt. Howard,. referring to an incident of lightning striking a building. In the [ inmemorandum, plaintiff stated that he realized he did not gather enough information before making his decision in that matter and apologized for any problems that this may have caused.
Plaintiff was also asked about a May 22, 1995, letter of reprimand sent to him by Sergeant Sterling Williams. This reprimand was issued to plaintiff for parking his vehicle in a parking space reserved for Captain Ursin. He admitted that he could have received a more severe penalty for this infraction than a letter of reprimand. Sergeant Williams was under Captain Ur-siris command at the time this letter of reprimand was sent.
Plaintiff received a June 6, 1995 memorandum from Sergeant Kirk Biales, informing him that he was delinquent in filing a report on an investigation involving another officer. Plaintiff received a memorandum dated June 20,1995 from Captain Ursin, indicating that a form he had filled out was incomplete He received another memorandum from Captain Ursin dated July 3,1995, indicating that another report was delinquent. Plaintiffs explanation was that sometimes a memorandum for delinquency is generated in the morning for a report that is due that day, and that it is possible the reports were turned in later that day and were not delinquent. In a memorandum dated November 18, 1995, plaintiff was. notified of another untimely report. In a memorandum dated November 19, 1995, plaintiff was notified of an incomplete memorandum that he had sent.
Plaintiff admitted receiving &■ letter of reprimand on November 19, 1995 from .Lt. Willow detailing three incidents of dereliction of duty or improper Inprocedure. Those incidents involved signing an affidavit with the wrong charge, not confiscating a weapon that was used in an accidental shooting, and an automobile accident. Plaintiff stated that he only received two letters of reprimand during his probationary period. Plaintiff received a memorandum on November 26, 1995 from Lt. Willow informing him that he violated department rules by not wearing his uniform properly.
On February 11, 1996, plaintiff received a memorandum' from Lt. Casanova, who was his immediate supervisor at that time. Lt. Casanova advised plaintiff that a report on a matter in which plaintiff was the supervising officer was incomplete and needed to be supplemented. Plaintiff did not write the report in question, but he signed off on it as supervising officer.
On the plaintiffs working test period evaluation form, Lt. Howard cited an occasion when plaintiff was unwilling to counsel a subordinate on correcting a community interaction form. Plaintiff testified that he disagreed with Lt. Howard on that, and stated that in his opinion, the subordinate’s actions did not require counseling. He also disagreed with Lt. Howard’s assessment that he made numerous errors in a report on an investigation of a police officer; plaintiff said there were some grammatical errors in the report, but the errors were not numerous. Regarding another incident on the evaluation in which Lt. Howard stated that plaintiff failed to instruct a subordinate on the proper handling of a miscellaneous incident, plaintiff testified that he properly instructed the subordinate in that matter.
hgThe next witness was Lt. Mark Willow, plaintiffs immediate supervisor at the 8th District from May 1995 until February 1996 until Lt. Willow was transferred to the 4th District. He stated that he conducted bimonthly evaluations of plaintiff during his probationary period and did not *635 ever find plaintiffs work to be deficient. He also conducted plaintiffs 1995 annual Civil Service rating evaluation, and did not find any deficiencies in his performance. Captain Ursin gave plaintiff a lower rating than Lt. Willow recommended, and Lt. Willow told Captain Ursin that he disagreed with that action.
He also supervised Sergeant Sposito at the 8th District during the same period. Lt. Willow testified that he was called back to the 8th District after his transfer to the 4th District to conduct the working test period evaluation of Sergeant Sposito. He did not know why he was not also asked to conduct plaintiffs working test period evaluation, and he never asked. Lt. Willow said the only working test period evaluation he has done was that of Sergeant Sposito.
Lt. Willow testified that he received a lot of correspondence about plaintiff from those above him in the chain of command, and he felt some of the complaints were unwarranted. He felt there was more attention from his superiors being paid to plaintiff than to the other probationary sergeants under his supervision. He even recommended to plaintiff that he ask for a transfer to another district’1
At the same time that plaintiff was a probationary sergeant, Lt. Willow was a probationary lieutenant. He said that Captain Ursin conducted his bimonthly evaluations, and Lt. Howard conducted his working test period and yearly evaluations. In his working test period and yearly evaluations, Lt. Willow was given lower ratings than in his bimonthly evaluations, but he was still granted permanent status as a lieutenant. He stated that he received his lower scores from 11BLt. Howard in March 1996. He was rated “Exceeds Requirements” in his bimonthly evaluations, but only “Competent” in his evaluations conducted by Lt. Howard. Lt. Howard told him that he gave him the lower rating because he was lax in his supervision responsibilities. Lt. Willow wrote on the back of this evaluation that he did not agree with Lt. Howard’s ratings and that they did not reflect his previous ratings by Captain Ursin. He did not appeal the lower ratings because appeals are only allowed for ratings below “Competent.” He stated that he could not say what prompted Lt. Howard to give him the lower ratings, and he could not say that the lower ratings were the result' of racial discrimination against him by Lt. Howard.
■ He stated that he did not know of any evidence to substantiate plaintiffs allegation that his denial of permanent status was because of racial discrimination. On plaintiffs bimonthly evaluation for the period from June 1, 1995 to August 1, 1995, Lt. Willow gave plaintiff a score of 4.0 out of a possible 5.0. For the period from August 1, 1995 to October 1, 1995, he gave plaintiff a score, of 4.0, and for the period from October 1, 1995 to December 15, 1995, he gave plaintiff a score of 3.6. Lt. Willow reviewed the memoranda sent by him to plaintiff during his probationary period, and memoranda about, plaintiff sent to him by his superiors.
Lt. Willow stated that the negative comments about plaintiff typed on the bimonthly evaluation for the period of August 1, 1995 to October 1, 1995 were not his, and were not on the form when he signed it. He also did not type the statement on the evaluation form for the period of October 1, 1995 to December 15, 1995 that plaintiff was “competent at best.”
He disagreed with all of Lt. Howard’s criticisms of plaintiff written on the working test period evaluation. Lt. Willow testified that in his opinion, plaintiff |.udeserved a rating of at least “Compe- - tent,” and probably “Exceeds Requirements.” He said that if he had conducted *636 plaintiffs working test period evaluation, he would have recommended that he receive permanent status as a sergeant. He acknowledged that even if this had happened, such a recommendation would still have been subject to approval from those above him in the chain of command. Lt. Willow’s recommendation that Sergeant Sposito receive permanent status was also subject to the approval of his superiors.
When plaintiff appealed his 1995 yearly Civil Service rating, Lt. Willow said he was not allowed to testify on plaintiffs behalf. Neither Lt. Willow nor plaintiffs attorney could point to any rule stating that an officer appealing his Civil Service rating is allowed to call witnesses at his appeal hearing.
Lt. Willow testified that he also conducted informal, quarterly evaluations of employees that he supervised. In these evaluations, supervisors noted employees’ “Areas of Strength” and “Areas for Improvement.” Under “Areas for Improvement,” Lt. Willow noted that plaintiff had failed to timely file reports with the NOPD Public Integrity Division (“PID”), and needed to pay more attention to detail and errors in correspondence and public reports.
After Lt. Willow testified, plaintiff resumed his testimony. He said his permanent status as a sergeant was denied before the announcement of the captains’ exam. Under the Williams consent decree, an officer could take tests in ranks two grades up, but not three. He claimed that by denying him permanent status as a sergeant, Lt. Howard was attempting to keep plaintiff from taking the captains’ exam so plaintiff would not be competing with him for the few captains’ positions reserved for black officers under the Williams consent decree. However, the Civil Service Commission allowed plaintiff to take the captain’s exam in 1996 11Reven though that was three grades higher than his rank as PO-IV. Plaintiff stated that his score on the captains’ exam placed him in Band IV, while Lt. Howard’s score placed him in Band V. At the time of the hearing, Band I had been exhausted, and the rule was that each Band had to be completely exhausted before going on to the next one. Even though plaintiff took the captains’ exam and was placed in Band IV, he admitted that would not be eligible for a captain’s position until he completed two years as sergeant and one year as a lieutenant.
Plaintiff was asked to explain how Lt. Howard’s actions related to his charges of racial discrimination by Captain Ursin. He pointed to the fact that Captain Ursin lowered plaintiffs yearly evaluation rating assigned to him by Lt. Willow; he claims Captain Ursin did this so it would be consistent with Lt. Howard’s recommendation to deny permanent status to plaintiff. He claims that when he parked in a space reserved for Captain Ursin, he received a letter of reprimand while two white officers who did the same thing received only verbal warnings. He stated that he was often judged more harshly than other officers for the same violations.
The next witness was Lt. Melvin Howard. He said-he was promoted to lieutenant on March 3, 1995, and was in his working test period for one year after that. He testified that at no point did he ask or suggest to Captain Ursin that he give plaintiff a negative recommendation. He said that he took and passed the captains’ exam in 1997 when he was a permanent lieutenant. He said he would not be in competition for a captain’s position with anyone with a rank less than permanent lieutenant.
Lt. Howard stated that he was assigned to conduct the working test period evaluation of plaintiff by Captain Ursin, because *637 of the information he had [^accumulated about plaintiff during his working test period. He said he was assigned to the 8th District for the entire time that plaintiff was in his working test period at the 8th District. He said in his career, he has conducted ten to fifteen working test period evaluations of subordinate officers.
Lt. Howard testified that he recommended that plaintiffs working test period be extended for six months because the information he had accumulated showed that plaintiff was unable to handle the position of police sergeant. He was later notified by Civil Service that extensions of working test periods are not allowed, so he was told that his only choices were to recommend that plaintiff be granted permanent status as a sergeant, or be denied permanent status and returned to his previous rank of PO-IV. Lt. Howard chose to recommend that plaintiff be denied permanent status.
When asked to explain why Lt. Willow was called back to conduct the working test period evaluation of Sergeant Sposito, but not plaintiff, Lt. Howard answered that Sergeant Sposito’s working test period was not problematic whereas plaintiffs working test period was. He said the Civil Service rules do not specify who has to conduct the working test period evaluation.
Lt. Howard stated that plaintiff did not perform the volume of work expected of a sergeant. He pointed out that plaintiff received two letters of reprimand during his working test period. He said he had to have several counseling sessions with plaintiff, more than for other probationary Sergeants under his supervision. He stated that plaintiff was stubborn and argumentative with supervisors. Lt. Howard also brought up an incident where two other officers complained to him that plaintiff had verbally abused them at a crime scene in front of other officers and some private citizens. He also mentioned another incident in which plaintiff 1^allowed a subordinate officer to dictate to him how the incident would be handled instead of plaintiff directing and instructing his subordinate. Lt. Howard stated that Lt. Casanova had complained to him when he first arrived for duty at -the 8th District that the report log for which plaintiff was responsible was in complete disarray. He also said that plaintiffs reports lacked content and substance, and his decisions were not well thought out. He said the forms and reports filled out by plaintiff consistently did not meet the standards of professionalism that he thought police officers, and particularly supervisors, should meet.
He stated that he did not know how plaintiff' scored on the captains’ exam in 1997, and that even if he found out that plaintiff had scored very high, that would not have affected his decision to recommend that plaintiff be denied permanent status as a sergeant. Lt. Howard said his recommendation was not made with any consideration of the upcoming captains’ exam. The decision to recommend that plaintiff be denied permanent status was made in February 1996, and the next captains’ exam was not given until 1997. He said that even though Lt. Willow was plaintiffs immediate supervisor, he did not agree that Lt. Willow spent more time supervising plaintiff than he did. His opinion is that he was more aware than Lt. Willow of the problems that plaintiff was having with others. He said that no negative information was brought to his attention about Sergeant Sposito, as it had been about plaintiff.
Lt. Howard testified that he was in the best position to evaluate plaintiff based on information he accumulated from all of the lieutenants who were plaintiffs immediate supervisors. He said that information pro *638 vided by one lieutenant might have been unknown to lieutenants who supervised plaintiff during a different part of his working test period. He testified that he felt he had more |1s“hands-on knowledge” about plaintiffs performance than Lt. Willow. He noted that he only recommended that plaintiff be denied permanent status; all of his superior officers agreed with his recommendation including the Appointing Authority, the Superintendent of Police.
When asked about the comments on two of plaintiffs bimonthly evaluations, which included “Lacks leadership ability, week [sic] communication skills, work usually has many errors. Employee is competent at best,” Lt. Howard stated that he did not add those comments and he did not know who did. Lt. Howard said that he has no problem counseling subordinates and telling them what they have done wrong and how they need to improve. His impression was that Lt. Willow was not as comfortable doing this, and was more concerned with being liked by his subordinates than in making the “tough calls.” He explained that this was not a criticism of Lt. Willow; they just have 'different management styles. Lt. Howard summarized by stating that he looked for police officers, particularly supervisors who were his subordinates, to be conscientious, fair and professional, and he did not see those traits in plaintiff.
Captain Gerald Ursin, Jr. was the next witness. Captain Ursin testified that he agreed with Lt. Howard’s recommendation that plaintiff be denied permanent status as a sergeant. He signed the recommendation and forwarded it up the chain of command. He said plaintiffs' race had nothing to do with his decision to agree with Lt. Howard’s recommendation. Captain Ursin said he is not usually involved on a day-to-day basis in disciplining subordinates. He said he usually leaves that up to the supervisors under his command.
Captain Ursin said that he signed off on Lt. Howard’s initial recommendation that plaintiffs working test period be extended for six months. It |13was only when they learned an extension was not an option that they made the decision to recommend denial of permanent status. He said the action was not intended as a punishment to plaintiff; in fact, he and Lt. Howard wanted to give plaintiff another six months to help develop plaintiff into someone who was “sergeant material.” He said many factors contributed to his decision to agree with Lt. Howard’s recommendation that plaintiff be denied permanent status, including his disciplinary record, his handling of PID cases, and his supervision of his subordinates. As Captain Ursin noted in his comments attached to his approval of Lt. Howard’s recommendation, he found that plaintiff did not perform satisfactorily in. the role of supervisor. He said that even after plaintiffs supervisors counseled him about deficiencies in his work, he failed to properly correct them and alter his actions.
Captain Ursin testified that he downgraded the rating given to the plaintiff by Lt. Willow in the annual Civil Service evaluation. Lt. Willow rated plaintiffs performance as competent, but Captain Ursin felt that plaintiffs performance during his working test period was unsatisfactory. He said that plaintiffs work consistently had errors. He said that everyone makes errors, but the key is to learn from those errors. Captain Ursin said that plaintiff kept repeating the same errors. He felt that some of plaintiffs decisions at crime scenes were not good, and other supervisors had brought these incidents to his attention. He also said that plaintiff had difficulty in completing assigned tasks on *639 time and in motivating others to do the same.
Regarding the typed comments on two of plaintiffs bimonthly evaluations, Captain Ursin said those were his comments. As stated above, on those evaluations, the following appeared under employee comments: “Lacks leadership liability, week [sic] communication skills, work usually has many errors. Employee is competent at best.” When asked to explain how a word in those comments was misspelled on both evaluations and why those comments were put under a section for employee comments, Captain Ursin said he wrote the comments on a piece of paper and gave them to a subordinate to type on plaintiffs evaluations. He said the misspelling and inclusion in the wrong section were simply errors, and that there was no doctoring of the form on his part. He testified that those comments were on the forms when he signed them.
When asked why Lt. Willow was called back to conduct Sergeant Sposito’s working test period evaluation but was not asked to do the same for plaintiff, Captain Ursin said that Lt. Howard would be the person to address that question to because he deferred to Lt. Howard on those types of matters. He said he was aware that if plaintiff had been granted permanent status, he could have been in competition with Lt. Howard for a captain’s position. He said when Lt. Casanova became plaintiffs supervisor, he immediately reported to his superiors that the report log for which plaintiff was responsible was “messed up.”
Lieutenant Richard Casanova testified that he supervised plaintiff for the last six to eight weeks of his working test period. During that time, he did not fill out any written evaluations on plaintiff. He said he learned from other people in the same platoon that plaintiff was having difficulty during his working test period. Lt. Howard told him at one point that he was trying to get plaintiffs working test period extended. He had conversations with Lt. Howard about plaintiffs performance, but Lt. Casanova was not asked to participate in the evaluation process. He noted one PID investigation that plaintiff conducted that was returned for deficiencies.
| s^The Commission rendered its original decision on October 3, 2000, granting plaintiffs appeal to the extent that his promotion to sergeant should be maintained retroactive to February 25, 1996, but dismissing as too speculative his claim for a retroactive promotion to lieutenant. As the Commission correctly notes, plaintiff has alleged that the denial of permanent status as sergeant is attributable more to racial considerations than performance of his duties during his working test period. The hearing examiner favored the version of facts advocated by plaintiff, and recommended that his appeal be granted. The Commission found that plaintiff produced sufficient facts to support the conclusion of the hearing examiner that plaintiffs evaluation at the conclusion of his working test period was- influenced by factors other than just his performance and that race was one of these factors.
In support of its decision, the Commission pointed to examples of what it found to be inconsistencies in plaintiffs evaluation process during his working test period. Specifically, it pointed to the facts that Lt. Willow was called back to conduct Sergeant Sposito’s working test period evaluation but not plaintiffs, and that Captain Ursin reconsidered and downgraded his earlier more favorable Civil Service rating of plaintiff. The Commission stated that it appeared to it to be more than mere coincidence that this change occurred about the same time .that Lt. Howard gave plaintiff an unsatisfactory rating at the conclusion of his working test period.
The Commission summarized the above-mentioned Williams consent decree, which *640 plaintiffs argument of racial discrimination is based upon, as follows:
In the Williams litigation, a number of black police officers sued claiming that as a result of racial discrimination black police officers had been denied [^promotions to .the positions of sergeant, lieutenant, and captain. At the conclusion of the litigation a consent decree was issued in federal court in New Orleans, the purpose of which was to accelerate the promotions of black officers to the ranks of sergeant, lieutenant, and captain. Supernumerary positions were created which only black police officers could fill. As part of this process a banding system was created on the promotional registers for sergeant, lieutenant and captain by which candidates were placed in a specific band based on their test score. Furthermore, under the consent decree, black officers could accelerate their promotional opportunities by taking a promotional exam for a position that was two grades ahead of their current rank.
According to plaintiff, Lt. Howard did poorly on promotional exams and felt threatened by plaintiff because a combination of plaintiffs high test scores and his race could put plaintiff on a faster track to Captain than Lt. Howard under the Williams consent decree. Plaintiff further alleges that Captain Ursin went along with Lt. Howard’s agenda because Captain Ur-sin was a friend of Lt. Howard and had personally selected him as the assistant commander of the 8th District.
After stating its conclusion that it is very difficult in this unusual case and in many other cases of this type to accurately determine the motivations of the individuals involved, the Commission ’nonetheless found that the argument advanced by plaintiff based on the Williams consent decree presented a “plausible explanation” for the claim that race played a role in “unreasonable inconsistencies” in plaintiffs working test period evaluations. The Commission also found that the Department of Police had not adequately explained these inconsistencies.
On appeal, the Department of Police argues that the Commission acted arbitrarily and capriciously, committed manifest error and exceeded its constitutional authority in reinstating plaintiff to the position of sergeant and in | ^promoting him to the position of lieutenant in the NOPD. La. Const. Art. 10, § 8B, regarding Civil Service Appeals, states:
No classified employee shall be discriminated against because of his political beliefs, sex, or race. A classified employee so discriminated against shall have the right of appeal to the appropriate commission pursuant to Section 12 of this Part. The burden of proof on appeal, as to the facts, shall be on the employee, (emphasis ours.)
Although La. Const. Art. 10, § 8B provides that the burden of proof in a Civil Service Commission appeal based on discrimination is on the employee, that article does not define the standard of proof required of the employee. Furthermore, our review of the case law involving Civil Service appeals based on discrimination does not reveal any cases specifically addressing the standard of proof in this type of case. In a Civil Service disciplinary action, the Appointing Authority has the burden of proving by a preponderance of the evidence the occurrence of the complained of activity and that the conduct complained of impaired the efficiency of the public service. Muhammad v. New Orleans Police Department, 2000-1034 (La.App. 4 Cir. 7/11/01), 791 So.2d 788. By analogy, we find that the employee in a Civil Service discrimination action has the burden of proving his or her claim by a preponderance of the evidence.
*641 Civil Service Commission rulings are reviewable on questions of law and fact. La. Const. Art. 10, § 12; Cha-Jua v. Department of Fire, 439 So.2d 1150 (La. App. 4 Cir.1983). The standard of review of actions by the Civil Service Commission is whether the conclusion reached is arbitrary or capricious or manifestly erroneous. Id. at 1151.
IzJn his March 12, 1996 appeal to the Civil Service Commission, plaintiff alleged that the denial to him of permanent status as a sergeant was racially discriminatory. He states in his appeal that the person who committed the discriminatory action was Captain Gerald Ursin. Plaintiff made the following statement in support of his claim:
On February 19, 1996 Captain Ursin Submitted a recommendation that appellant be denied permanent status as a Police Sergeant. However, all bimonthly probationary evaluation reports on appellants work record as a Police Sergeant rated him as “Outstanding” or “Exceeds Requirement”, save for the final evaluation form which Captain Ursin altered or caused to be altered from an initially satisfactory report rating the appellant as “Exceeds Requirements” to one that was unsatisfactory.
Plaintiff had the burden of proving that he was discriminated against because of his race by Captain Ursin. In his testimony, plaintiff focuses almost exclusively on the alleged actions and motivations of Lt. Howard. The main allegations directed at Captain Ursin were that he allowed Lt. Howard to conduct plaintiffs working test period evaluation, agreed with Lt. Howard’s recommendation that plaintiff be denied permanent status, and lowered plaintiffs 1995 Civil Service rating to unsatisfactory after initially signing off on Lt. Willow’s rating of plaintiff as competent.
The only evidence offered to support plaintiffs allegation that Captain Ursin discriminated against him because of his race was plaintiffs own self-serving testimony. None of the other officers who testified, including Lt. Willow who gave plaintiff higher ratings than Lt. Howard, corroborated plaintiffs claim that the denial of his permanent status was based on racial discrimination. Captain Ursin specifically stated that he was not motivated by race in agreeing with Lt. Howard’s recommendation that plaintiff be denied permanent status; rather, he said l¡>Rhe was in complete agreement with Lt. Howard’s assessment that plaintiffs job performance fell short of that expected of a permanent sergeant. Furthermore, every officer above Captain Ursin in the chain of command, including the Superintendent of Police, agreed with Lt. Howard’s recommendation.
As for the Commission’s finding that there were “unreasonable inconsistencies” in plaintiffs working test period, the record shows only that plaintiffs and Sergeant Sposito’s final working test period evaluations were handled differently in that Lt. Willow supervised both officers for most of their working test period, but was only called back to perform Sergeant Sposito’s final evaluation. Lt. Howard explained the reasons why he conducted plaintiffs final evaluation. He stated that plaintiffs working test period was problematic whereas Sergeant Sposito’s was not, and he said that he had accumulated information from all of plaintiffs supervisors during his working test period and had received complaints about plaintiff that he had not received about Sergeant Sposito. Therefore, because he had acquired this information and had personally observed and counseled plaintiff during his entire working test period, Lt. Howard felt he was in a better position to evaluate plaintiffs overall performance than Lt. Willow. Captain Ursin deferred to Lt. Howard’s *642 judgment on that matter. Captain Ursin noted in his report supporting Lt. Howard’s recommendation that six officers in plaintiffs chain of command, including Ur-sin, counseled plaintiff about deficiencies in his job performance, yet plaintiff did not take steps to correct those deficiencies.
Although the Commission stated that “under the practice” of the police department, the immediate supervisor of the probationary officer conducts the final working test period evaluation, it 'is undisputed that there is no rule dictating that | j>fionly the immediate supervisor can conduct the working test period evaluation. Lt. Howard was in plaintiffs chain of command, and was authorized to conduct the evaluation. The record is replete with evidence that plaintiffs working test period as a probationary sergeant was problematic. The fact that Lt. Howard’s opinion of plaintiffs performance differed from Lt. Willow’s opinion does not constitute proof that Lt. Howard’s negative evaluation was racially motivated. Furthermore, it is important to note that Lt. Howard’s original recommendation was to extend plaintiffs working test period for another six months, and only recommended denial of permanent status after learning that Civil Service rules did not allow extensions of working test periods for police officers.
Plaintiffs argument that Captain Ursin “rubber stamped” Lt. Howard’s recommendation to further Lt. Howard’s career goals is mere speculation, and not supported by any evidence other than plaintiffs own self-serving testimony.
As for Captain Ursin’s decision to downgrade plaintiffs Civil Service rating to unsatisfactory after initially agreeing with Lt. Willow’s rating of competent, Captain Ursin explained that he initially signed off on Lt. Willow’s rating in error. When he realized his error, he promptly corrected it. He said he never intended to agree that plaintiffs performance was competent. Nothing in the record other than plaintiffs, testimony supports his claim that Captain Ursin’s decision to change his rating was racially motivated.
The Department of Police did not have the burden of proving the absence of racial discrimination in this case; the plaintiff had the burden of proving discrimination by a preponderance of the evidence. He failed to carry 'that burden. For that reason, we find that the Commission was manifestly erroneous in granting plaintiffs appeal and promoting him to sergeant retroactive to February 25, 1996. | g,? For the same reason, the Commission’s subsequent promotion of plaintiff to lieutenant retroactive to July 23,1997 was also manifestly erroneous, as was the Commission’s denial of the Department of Police’s motion for reconsideration of that ruling.
The rulings of the Civil Service Commission dated October 3, 2000, December 14, 2000 and January 25, 2001 are hereby reversed. The appeal of plaintiff, Simon Hargrove, to the Civil Service Commission is dismissed.
REVERSED

. Plaintiff was made a probationary Sergeant again in May 1998.